IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-85

No. 269A21

Filed 15 July 2022

IN THE MATTER OF: J.A.J., K.D.M.J., and P.A.P.J.

Appeals pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 25 May 2021 by Judge Pell C. Cooper in District Court, Wilson County. This matter was calendared for argument in the Supreme Court on 1 July 2022 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Beaman & Bennington, PLLC, by Jennifer K. Bennington, for petitioner-appellee Wilson County Department of Social Services.*

*Matthew D. Wunsche, GAL appellate counsel, for appellee Guardian ad Litem.*

*Sean P. Vitrano for respondent-appellant mother.*

*Anné C. Wright for respondent-appellant father.*

HUDSON, Justice.

¶ 1 Respondent-mother and respondent-father appeal from the trial court's orders terminating respondent-mother's parental rights to her minor children J.A.J. (Jake), K.D.M.J. (Karl), and P.A.P.J. (Pamela)[1] and an order terminating respondent-father's

---

[1] Pseudonyms have been used to protect the identities of the juveniles and for ease of reading.

parental rights to Karl.[2] Upon review, we affirm.

## I. Factual and Procedural Background

On 11 and 17 December 2018, the Wilson County Department of Social Services (DSS) filed separate juvenile petitions alleging that two-year-old Jake, six-year-old Karl, and newborn Pamela were neglected and dependent juveniles. Each petition alleged that on 7 December 2018, family members observed Karl to be "rigid, staring, grinding his teeth, having mild tremors, incontinent, weak, and [with] his left side . . . drooping." When respondent-mother did not seek immediate medical care for what she felt was more of "a behavioral issue," family members transported Karl to Wilson Medical Center, where his "condition rapidly deteriorated, and he lost the ability to speak." The next day, Karl was transferred to Vidant Medical Center where he was placed on a ventilator, after becoming unable to breathe. Respondent-mother reportedly refused to authorize medical treatment and was ultimately escorted from the facility by law enforcement officers.

During the course of an investigation, Karl disclosed that he had ingested pills belonging to respondent-mother's boyfriend. Respondent-mother admitted that she was a long-time substance abuser and that she was unable to provide a safe, stable environment for her children. The whereabouts of Karl's father, respondent-father, were unknown at the time.

---

[2] Jake's father and Pamela's father are not parties to this appeal.

¶ 4    DSS obtained nonsecure custody of Jake and Karl on 11 December 2018 and of Pamela on 18 December 2018.[3] Jake and Pamela were placed in foster care. Karl was placed with a relative "after several failed foster placements."

¶ 5    A hearing on the juvenile petitions was conducted on 20 February 2019. With the assistance of counsel, respondent-mother and respondent-father submitted stipulations in accord with allegations set forth in the juvenile petitions. After considering DSS reports, testimony, and respondents' stipulations, the trial court adjudicated Jake, Karl, and Pamela neglected and dependent juveniles by orders entered on 4 March 2019.

¶ 6    In its disposition orders entered on the same date, the trial court found, *inter alia*, that respondent-mother had acknowledged Karl needed mental health treatment but had refused to authorize it. The trial court found that, "[w]hen he does not get what he wants," Karl has "severe behavior problems." His diagnoses include Adjustment Disorder, Oppositional Defiant Disorder, Attention Deficit Hyperactivity Disorder, and Sibling Relational Problem. He had run away from respondent-mother's home on numerous occasions, as well as the homes of every other caregiver, including foster families, with whom he had been placed. Between 11 and 21 December 2018, Karl had been placed in three foster homes and had one night of respite placement and one night of care at a hospital. Respondent-mother's visitation

_____

[3] Pamela was born four days after the juvenile petitions for Jake and Karl were filed.

with Karl was suspended due to the severity of his behavior following her visits.

¶ 7        The court acknowledged that respondent-mother loves her children. But she also had a long history with Child Protective Services and a history of substance abuse. She did not feel the need for treatment for mental health issues or substance abuse.

¶ 8        At the time of the hearing on Karl's juvenile petition, respondent-father was incarcerated in the Craven County Correctional Institute on drug charges. He had not been an active part of Karl's life, but he indicated his desire to be a father to Karl upon his release.

¶ 9        The court ordered respondent-mother to complete a safety circle with a social worker and develop a safety plan to ensure the juveniles would be properly supervised at all times. She was also ordered to complete a psychological evaluation; work with a mental health provider to learn healthy coping skills, identify healthy relationships, and receive emotional support regarding her domestic violence relationships; and work with a parent trainer to learn parenting skills for a child with behavioral challenges. Respondent-mother was allowed a minimum of one hour of weekly supervised visitation with Jake and Pamela and a minimum of one and one-half hours of weekly supervised telephone contact with Karl. Respondent-father was allowed the same amount of supervised telephone contact with Karl and was ordered to work with a social worker to develop a service plan upon his release from incarceration.

¶ 10    A review hearing was conducted on 20 March 2019. In separate amended review orders entered for each juvenile on 11 April 2019, the trial court found that respondent-mother needed to address her substance abuse and mental health issues, refrain from domestic violence, and demonstrate an ability to provide a safe living environment and manage the juveniles' needs. Respondent-mother's in-person contact with Karl would remain suspended until his mental health needs were addressed and his trauma in conjunction with his visits with respondent-mother reduced. The court found that respondent-mother wanted to be reunified with the juveniles. She had acquired public housing to accommodate herself and her children, had participated in a Child and Family Team Meeting on 3 January 2019; and had reportedly contacted Carolina Outreach to schedule a substance abuse evaluation.

¶ 11    The trial court further found that DSS had referred respondent-mother to psychologist Shartra Sylivant for a psychological evaluation, provided her with the contact information for the Social Security Administration to apply for social security disability benefits, and referred her to DSS's parenting program to assist her with learning how so that she could parent and manage children who had experienced past trauma. Respondent-father remained incarcerated.

¶ 12    In permanency-planning orders entered on 30 August 2019 following a 31 July 2019 hearing, the trial court found that return of the juveniles to respondent-mother's home would be contrary to their best interests due to her "partial progress within the

last seven months towards her court ordered Family Services activities such as emotional/mental health, substance abuse including requested drug screens, and parenting." She had also refused to sign a family contact and visitation plan, comply with the visitation agreement, submit to requested drug screens, or submit to a substance abuse assessment. Respondent-mother believed Karl's behavior was the reason for DSS involvement and contended that the juveniles were wrongly adjudicated neglected and dependent.

¶ 13     After respondent-mother's limited participation in a psychological evaluation in June 2019, Sylivant diagnosed respondent-mother with "Cannabis and Phencyclidine (PC) use disorders, Personal History of Psychological Trauma, Partner Violence, Parental Child Neglect, Discord with Social Services, and Antisocial Personality Disorder with additional histrionic, borderline and paranoid traits." Sylivant reported respondent-mother also had "a number of problematic personality traits," which would not likely be ameliorated by psychotherapy or medication. Sylivant reported that respondent-mother's prognosis for significant and lasting behavior change was "poor."

¶ 14     Respondent-father was released from incarceration on 20 June 2019; however, he was reincarcerated on 27 June 2019 for trafficking in heroin. Shortly thereafter, a social worker met with respondent-father at the Wilson County Detention Center on 10 July 2019 to create a family contact and visitation plan. Respondent-father

requested a visit with Karl, but face-to-face meetings during respondent-father's incarcerations were never allowed based on a determination that a meeting at the jail was not in Karl's best interests.

¶ 15       In the August 2019 permanency-planning orders, the court set custody with a relative or other suitable caregiver as the primary permanent plans for Jake and Karl with a secondary, concurrent plan of reunification. For Pamela, the permanent plan was reunification with a concurrent plan of custody with a relative or other suitable person. Respondent-mother was permitted supervised visitation with the juveniles every other week and supervised telephone calls at least weekly. Respondent-father was allowed mail correspondence and supervised telephone contact with Karl.

¶ 16       The trial court conducted permanency-planning hearings on 20 November 2019 and 4 March 2020 and entered permanency-planning orders on 13 December 2019 and 31 March 2020.  In the December 2019 orders, the court noted "concerns that" respondent-mother "was having unsupervised contact" with Karl. Karl's kinship placement had been unsuccessful, and DSS had placed Karl with a foster family. The court ceased respondent-mother's contact with the juveniles until she "exhibited behavioral changes, made progress towards her Family Service Agreement, and complied with her signed family contact and visitation plan." In the March 2020 orders, the court noted that respondent-mother remained homeless and unemployed. Meanwhile, respondent-father had had no contact with Karl since the

last permanency-planning hearing. The court changed Jake's and Karl's primary permanent plan to adoption with parental reunification as a concurrent plan.

¶ 17 Following the next hearing on 22 June 2020, the court entered permanency-planning orders on 22 July 2020 finding that respondent-mother had made "minimal progress towards her court ordered activities" involving emotional and mental health issues and substance abuse. The primary permanent plan for Pamela was also changed to adoption with a concurrent plan of reunification with her father.

¶ 18 DSS filed motions and petitions to terminate respondent-mother's parental rights to Jake, Karl, and Pamela and respondent-father's parental rights to Karl on 22 September 2020. DSS alleged that respondent-mother's parental rights could be terminated under N.C.G.S. § 7B-1111 for abuse or neglect; willfully leaving the juveniles in placement outside of the home without showing reasonable progress in correcting those conditions which led to the removal of the juveniles; willful failure to pay a reasonable portion of the cost of care for the juveniles; dependency; and willful abandonment. DSS alleged the same as grounds to terminate respondent-father's parental rights to Karl.

¶ 19 The court entered amended permanency-planning orders for each juvenile on 25 November 2020, following a fifth permanency-planning hearing on 23 September 2020, and permanency-planning orders on 12 February 2021, following a sixth hearing on 20 January 2021. In its final permanency-planning order related to Karl,

the court found that respondent-mother had made "minimal progress" since the last permanency-planning hearing and that respondent-father would remain incarcerated until August 2024.

¶ 20     A hearing on DSS's motions to terminate respondent-mother's parental rights to the juveniles and respondent-father's parental rights to Karl was held on 18, 19, and 22 March and 26 April 2021. In orders entered on 25 May 2021, the trial court adjudicated the existence of grounds to terminate respondent-mother's parental rights to Jake, Karl, and Pamela pursuant to N.C.G.S. § 7B-1111(a)(1)–(3) and (6). The court also adjudicated the existence of grounds to terminate respondent-father's parental rights to Karl pursuant to N.C.G.S. § 7B-1111(a)(1), (2), (6), and (7). In the disposition part of the orders, the court determined that it was in the best interests of each juvenile to terminate respondent-mother's parental rights, and that it was in the best interests of Karl to terminate respondent-father's parental rights. Accordingly, the trial court terminated respondent-mother's parental rights to Jake, Karl, and Pamela and respondent-father's parental rights to Karl. Respondent-mother and respondent-father separately appeal from the 25 May 2021 termination orders.

## II.    Analysis

## A. Respondent-Mother's Competency

¶ 21    Respondent-mother argues that the trial court erred by failing to appoint a guardian ad litem to aid her, pursuant to N.C.G.S. § 7B-1101.1, after her competency was brought into question. Following the first review hearing, the trial court noted that respondent-mother was suffering from mental illness and that she was not consistent in receiving mental health treatment. Respondent-mother contends that her behavior during the hearing to terminate her parental rights, in which she exhibited "little or no understanding" as to why her children were in DSS custody, should have caused the court to inquire into her competency.

¶ 22    Section 7B-1101.1 states that "the court may appoint a guardian ad litem for a parent who is incompetent in accordance with G.S. 1A-1, Rule 17." N.C.G.S. § 7B-1101.1(c) (2021). For the purposes of Rule 17, an "incompetent adult"

> is an adult "who lacks sufficient capacity to manage the adult's own affairs or to make or communicate important decisions concerning the adult's person, family, or property whether the lack of capacity is due to mental illness, intellectual disability, epilepsy, cerebral palsy, autism, inebriety, senility, disease, injury, or similar cause or condition."

*In re N.K.*, 375 N.C. 805, 809–10 (2020) (quoting N.C.G.S. § 35A-1101(7) (2019)).

¶ 23    "[A] trial judge has a duty to properly inquire into the competency of a litigant in a civil trial or proceeding when circumstances are brought to the judge's attention [that] raise a substantial question as to whether the litigant is *non compos mentis*." *In re T.L.H.*, 368 N.C. 101, 106 (2015) (second alteration in original) (quoting *In re*

*J.A.A.*, 175 N.C. App. 66, 72 (2005)). Though the nature and extent of diagnoses by mental health professionals are exceedingly important to the proper resolution of a competency determination, a court may also consider

> the manner in which the individual behaves in the courtroom, the lucidity with which the litigant is able to express himself or herself, the extent to which the litigant's behavior and comments shed light upon his or her understanding of the situation in which he or she is involved, the extent to which the litigant is able to assist his or her counsel or address other important issues, and numerous other factors.

*Id.* at 108. Thus, much of the information pertinent to a competency determination is not discernible from a review of a trial record. *Id.* We review a court's decision to inquire into a parent's competency as well as a decision to appoint a parental guardian ad litem due to the parent's incompetence for abuse of discretion. *Id.* at 106. When the record on appeal "contains an appreciable amount of evidence tending to show that the litigant whose mental condition is at issue is not incompetent, the trial court should not, except in the most extreme instances, be held on appeal to have abused its discretion by failing to inquire into that litigant's competence." *Id.* at 108–09; s*ee In re Q.B.*, 375 N.C. 826, 834, 838 (2020) (affirming a termination of parental rights although the court did not inquire about the respondent's mental competence when the record presented sufficient indicia of her understanding of the nature of the proceedings, including that she comprehended her role therein, and could assist her attorney in preparing the case); *In re N.K.*, 375 N.C. at 812 (holding the trial court

did not abuse its discretion by not inquiring about the respondent's need for a guardian ad litem where the court had "ample opportunity to gauge [her] competence" by observing her behavior during pre-adjudicatory, adjudicatory, and dispositional hearings, subsequent review and permanency-planning hearings, and the termination-of-parental-rights hearing).

¶ 24        Here the record reflects that respondent-mother was in court during the juveniles' adjudication and disposition hearings, the review hearing, five permanency-planning hearings, and three of the four days of the termination of parental rights hearing. During the adjudication hearing on the juvenile petitions, with the assistance of counsel, respondent-mother entered stipulations and denied some allegations. In its juvenile disposition order, the court made a finding reflecting respondent-mother's denial of any need for mental health treatment. By the time of the first review hearing, respondent-mother had made progress on her case plan. She also participated in a psychological evaluation, which opined that her intelligence "appear[ed] sufficient, as evidenced by her vocabulary, reading ability, and manipulations."

¶ 25        Respondent-mother contends that her testimony during the termination-of-parental-rights hearing did not demonstrate an understanding of how her mental health, domestic violence, criminal conduct, homelessness, and substance abuse issues affected her parenting or why she needed to comply with her case plan and

court orders. But her testimony reflects her efforts to obtain help caring for the children and to provide Karl with therapy, as well as her attendance at parenting classes. She also testified that she had attended every court hearing and participated in child family team meetings so that she could be reunited with her children. The transcript also captures respondent-mother's repeated extemporaneous interjections during the termination proceedings. The substance of her interjections, often challenging witness testimony, demonstrates her clear understanding of the specific issues being discussed and her goal of obtaining custody of her children.

¶ 26    The record shows that the court had ample opportunity to observe respondent-mother's behavior and that she understood the nature of the proceedings up to and including the termination hearing, comprehended her role in them, and could assist her attorney in preparing her case. *See In re Q.B.*, 375 N.C. 826; *In re N.K.*, 375 N.C. 805. Therefore, the trial court did not abuse its discretion by not conducting an inquiry into respondent-mother's competency. *See In re T.L.H.*, 368 N.C. at 108–09.

**B. Adjudication of Grounds to Terminate Respondent-Father's Parental Rights**

¶ 27    Respondent-father argues the trial court failed to adequately support its conclusions that grounds existed to terminate his parental rights to Karl. He challenges each of the court's four adjudicated grounds. We address respondent-father's argument regarding willful abandonment.

"We review a trial court's adjudication under N.C.G.S. § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.' " *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). Unchallenged findings of fact "are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97 (1991)).

A trial court may terminate parental rights when "[t]he parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition." N.C.G.S. § 7B-1111(a)(7) (2021). "Although the trial court may consider a parent's conduct outside the six-month window in evaluating a parent's credibility and intentions, the 'determinative' period for adjudicating willful abandonment is the six consecutive months preceding the filing of the petition." *In re N.D.A.*, 373 N.C. 71, 77 (2019) (quoting *In re D.E.M.*, 257 N.C. App. 618, 619 (2018)). "Whether a biological parent has a willful intent to abandon his child is a question of fact to be determined from the evidence." *In re B.C.B.*, 374 N.C. 32, 35 (2020) (quoting *In re Adoption of Searle*, 82 N.C. App. 273, 276 (1986)). "Abandonment implies conduct on the part of the parent which manifests a willful determination to forego all parental duties and relinquish all parental claims to the child." *Id.* (quoting *In re Young*, 346 N.C. 244, 251 (1997)). We have noted that abandonment is evident when a parent "withholds his presence, his love, his care, the opportunity to display filial

affection, and wil[l]fully neglects to lend support and maintenance." *Pratt ex rel. Graham v. Bishop*, 257 N.C. 486, 501 (1962).

"Although a parent's options for showing affection while incarcerated are greatly limited, a parent will not be excused from showing interest in his child's welfare by whatever means available." *In re A.J.P.*, 375 N.C. 516, 532 (2020) (cleaned up). "As a result, our decisions concerning the termination of the parental rights of incarcerated persons require that courts recognize the limitations for showing love, affection, and parental concern under which such individuals labor while simultaneously requiring them to do what they can to exhibit the required level of concern for their children." *In re A.G.D.*, 374 N.C. 317, 320 (2020) (citing *In re K.N.*, 373 N.C. 274, 283 (2020)).

Here the trial court supported the adjudication of grounds to terminate respondent-father's parental rights via the following findings of fact:

> 35. A court previously determined [respondent-father] to be the father of the Juvenile on or about April 3, 2012. [Respondent-father] is now listed on the Juvenile's birth certificate.
>
> 36. [Respondent-father] was in jail at the time of the Adjudication, and with the exception of a very short period, [he] has been incarcerated the entire time [Karl] has been in the Department's care. [Respondent-father] is not scheduled to be released until August 2024.
>
> 37. [Respondent-father] has participated in some of the child and family teams meetings via phone.

38. Prior to the Juvenile Petition, [respondent-father] had not been active in [Karl's] life, and during the majority of the Juvenile case, [he] has made little to no effort to have a relationship with [Karl].

39. Up until the September 23, 2020 Permanency Planning Hearing, [respondent-father] was permitted to contact [Karl] by phone or write him letters; however he never called [Karl] and never wrote to him. Even from December 2018 to October 2019, when [Karl] was placed with . . . a kinship placement [respondent-father] knew, he still failed to contact [Karl]. On September 23, 2020 as no phone contact had been occurring, the court ordered any contact between [respondent-father] and [Karl] to take place via mail, however, [respondent-father] did not send any letters or cards to [Karl].

40. During the course of this case, [respondent-father] has provided no support, no letters, no phone calls, and no gifts to [Karl] during the past two years.

41. [Respondent-father] voluntarily decided not to be brought to the third day of the trial, and he requested to leave early on the fourth day.

42. By failing to make even minimal efforts to have a relationship with his son, [respondent-father] willfully failed to show love, support, and affection for [Karl] during this case.

. . . .

B. [Respondent-father] has willfully abandoned the child for at least six consecutive months immediately preceding the filing of the petition.[4]

---

[4] While respondent-father also asserts that the trial court failed to make any findings specifically addressing the determinative six-month period, the trial court determined that respondent-father "has willfully abandoned the child for at least six consecutive months."

¶ 32    Respondent-father challenges the evidentiary support for findings of fact 37, 39, 40, and 41. He also contends the trial court's findings are insufficient to support the conclusion that grounds existed to terminate his parental rights for willful abandonment.

¶ 33    Respondent-father argues that finding of fact 37 is erroneous because no evidence was presented, and the trial court made no findings, regarding when he attended Child and Family Team meetings and if his attendance occurred during the determinative six-month period. The petition to terminate parental rights was filed on 22 September 2020; thus, the determinative six-month period is from 22 March to 22 September 2020. No evidence suggests respondent-father attended any meetings during the determinative period. As respondent-father noted, in the sixth permanency-planning order, the trial court found that respondent-father had participated in a Child and Family Team meeting on 3 November 2020. While the trial court should have made findings concerning the dates of respondent-father's participation in the Child and Family Team meetings, any possible error is harmless

Although this determination is labeled as a conclusion of law, regardless of how this determination is classified, "that classification decision does not alter the fact that the trial court's determination concerning the extent to which a parent's parental rights in a child are subject to termination on the basis of a particular ground must have sufficient support in the trial court's factual findings." *In re N.D.A.*, 373 N.C. at 76–77. As a result, we determine that respondent-father's assertion is erroneous, and we consider the extent to which the evidentiary findings support the ultimate findings and conclusions below.

because the evidence indicates his participation fell outside of the determinative period. *In re J.D.C.H.*, 375 N.C. 335, 342 (2020).

¶ 34 Respondent-father asserts "there was no evidence offered at the termination adjudication hearing to support" the portions of findings of fact 39 and 40 indicating that he never called Karl or provided gifts. Respondent-father acknowledges social workers' testimony that they were not aware of him ever calling Karl or sending Karl any gifts, but he contends that "[n]ot being aware of something is not evidence that it did not happen." Respondent-father's argument relies upon *In re V.M.F.*, 209 N.C. App. 204, 2011 N.C. App. Lexis 105, at *7 (2011) (unpublished), which he asserts "has precedential value to a material issue in the instant case and there is no published opinion that would serve as well." Respondent-father's reliance on *In re V.M.F.* is misplaced, and because the case is readily distinguishable, we reject any argument that it has precedential value.

¶ 35 At issue in *In re V.M.F.* was whether there was support for the finding that the respondent's attempt at legitimating his child occurred only after the filing of the petition to terminate his parental rights. *Id.* at *6–7. The petitioner, the child's mother, had sought to establish that the respondent had filed an affidavit of paternity after the termination petition. *Id.* at *4–5. At the adjudication hearing, the respondent submitted evidence to establish that the affidavit was filed before the termination petition. *Id.* at *7. Instead of presenting any evidence to the contrary,

the petitioner testified "that she was not 'aware' of [the] respondent's filing of an affidavit of paternity prior to the filing of the petition and that she thought she became 'aware' of the affidavit after the first court hearing." *Id.* The Court of Appeals concluded that this testimony could not establish that the respondent filed the affidavit after the filing of the termination petition, and "[g]iven the absence of any other evidence" indicating such, the trial court's finding was not supported by clear, cogent, and convincing evidence. *Id.*

¶ 36    Here, the only testimony concerning whether respondent-father ever called Karl or provided any gifts was offered by the social workers on behalf of DSS. It was respondent-father who failed to present any evidence to the contrary. Moreover, the trial court did not rely solely upon the social workers' testimony to support its finding. The orders from the prior permanency-planning hearings were admitted into evidence and considered by the court. In the first permanency-planning order, entered on 30 August 2019, the trial court permitted monitored written and supervised telephone communication between respondent-father and Karl. In each of the following four permanency planning orders, the court found there had "been no telephone contact or mail exchanges."

¶ 37    It is well established that the trial court has the duty to determine the weight and veracity of evidence and the reasonable inferences to be drawn therefrom. *E.g., In re D.L.W.*, 368 N.C. 835, 843 (2016). It was reasonable for the trial court to find

that respondent-father had never called Karl or provided him with any gifts. Findings of fact 39 and 40 are supported by clear, cogent, and convincing evidence.

¶ 38    Respondent-father argues there is no evidence to support the portion of finding of fact 41 that states he requested to leave early on the fourth day of the termination hearing. We agree. Thus, we disregard that portion of the finding. *In re N.G.*, 374 N.C. 891, 901 (2020).

¶ 39    Respondent-father further contends that the trial court failed to make sufficient findings to establish that his conduct was willful, citing the Court of Appeals' decision *In re D.M.O.*, 250 N.C. App. 570, 578 (2016). He asserts that the court here failed to make findings related to his ability "to perform the conduct underlying its conclusion." He argues that "the trial court's permission to call or write does not mean that [he] had the ability or capacity to take those actions while he was incarcerated." He asserts that his conduct did "not manifest a willful determination to forego all parental duties and relinquish all parental claims to Karl," because he "was present at most of the hearings," he once requested in-person visitation, he requested telephone communication after the trial court had rescinded that option, and he had expressed a desire to "step up and be a father to his child upon his release." We disagree.

¶ 40    The majority of the evidence respondent-father mentions falls outside the determinative six-month period. Thus, the trial court was permitted, but not

required, to consider that evidence in determining respondent-father's credibility and intentions. *In re N.D.A.*, 373 N.C. at 77. Respondent-father's statement related to his desire to parent Karl was introduced at the adjudication hearing, through the testimony of a social worker reading from the initial disposition order. This order was entered on 4 March 2019, a year before the start of the determinative period. Respondent-father requested in-person visitation on 10 July 2019, eight months preceding the beginning of the determinative period. "[M]ost of the hearings" respondent-father referred to occurred before the determinative period: he was present at the initial adjudication and disposition hearing held on 20 February 2019, the review hearing held on 20 March 2019, and the permanency-planning hearings held on 31 July 2019, 20 November 2019, and 4 March 2020. He was not present at the permanency-planning hearing held on 22 June 2020, that took place during the determinative period, or at the two hearings held on 23 September 2020 and 20 January 2021, after the determinative period. Following the 23 September 2020 hearing, the trial court revoked respondent-father's right to contact Karl by telephone. Respondent-father requested at the 3 November 2020 Child and Family Team meeting that telephone contact be reinstated, and in the order entered after the 20 January 2021 permanency-planning hearing, the court allowed additional contact outside of mail exchange "in the discretion of [DSS] after consulting with the juvenile and the juvenile's therapist."

¶ 41     The trial court's findings report that respondent-father "voluntarily decided" not to attend the third day of the termination hearing, which respondent-father argues is not an indication of abandonment. Regardless, as with the evidence cited by respondent-father, the court was free to consider respondent-father's request to be excused from attending the hearing that day "in evaluating [his] credibility and intentions." *In re N.D.A.*, 373 N.C. at 77 (quoting *In re D.E.M.*, 257 N.C. App. at 619). In a colloquy with the trial court, respondent-father indicated he preferred to work his job assignment at the detention center rather than to attend the third day of the hearing.

¶ 42     Respondent-father's argument that the court was required to make findings related to his ability to communicate with Karl is misplaced. The Court of Appeals' decision in *In re D.M.O.* is neither binding on this Court nor applicable to the instant case. The respondent in *In re D.M.O.* was incarcerated intermittently during the course of the case, including for approximately five months of the determinative period. 250 N.C. App. at 575. To support its conclusion that the respondent willfully abandoned her child, the trial court found that during the determinative period the respondent failed to attend the child's sports games, failed to voluntarily visit her child or attend court-ordered visitations, claimed that she sent two letters, sent "a small number of" text messages during the periods she was not incarcerated, and

"made attempts to call." *Id.* at 573–75. The Court of Appeals concluded these findings

were insufficient because the trial

> court never made findings addressing how [the respondent's] periodic incarceration at multiple jails, addiction issues, or participation in a drug treatment program while in custody might have affected her opportunities to request and exercise visitation, to attend games, or to communicate with [the child]. The trial court made no findings establishing whether [the respondent] had made any effort, had the capacity, or had the ability to acquire the capacity, to perform the conduct underlying its conclusion that [the respondent] abandoned [the child] willfully.

*Id.* at 578.

¶ 43        Here, the trial court identified the "minimal efforts" that respondent-father

could have made while incarcerated to have a relationship with his son:

communicating with Karl by telephone or through mail by sending letters, cards, or

gifts. Unlike *In re D.M.O.*, the trial court here looked to see if respondent-father took

actions that were available to him while he was incarcerated and made findings that

he failed to make any efforts at communication. The court's findings indicate that

respondent-father never called Karl and never sent a letter, card, or gift while Karl

was in DSS care. While respondent-father was aware of the actions he could take, the

evidence and the findings of fact indicate that he was unwilling "to take any action

whatsoever to indicate that he had any interest in preserving his parental connection

with" Karl. *In re A.G.D.*, 374 N.C. 317, 327 (2020). A social worker supervisor testified

that she was unaware of any attempts by respondent-father to obtain the contact information for Karl's placements, and the trial court allowed flexibility for telephone contact outside the specified times "as agreed upon by the caretaker." Once the trial court revoked telephone communication, respondent-father requested it be reinstated because he "did not want to write any letters."

¶ 44      The trial court's findings of fact support the ultimate findings and conclusion that respondent-father willfully abandoned Karl during the six months preceding the filing of the petition. *See In re M.S.A.*, 377 N.C. 343, 2021-NCSC-52, ¶¶8, 12 (concluding that the respondent's failure to utilize "whatever means available" to him to maintain a relationship with his child while he was incarcerated amounted to willful abandonment); *In re K.N.K.*, 374 N.C. 50, 54–55 (2020) (concluding that termination was justified based on willful abandonment when the respondent had no contact with the minor child, provided no financial support, and sent no cards, gifts, or other tokens of affection not only during the determinative six-month period, but at any point during the approximately three years preceding the filing of the termination petition).

¶ 45      Thus, we conclude that the trial court did not err in adjudicating grounds to terminate respondent-father's parental rights for willful abandonment. *See* N.C.G.S. § 7B-1111(a)(7). Because an adjudication of one ground is sufficient to support a

termination of parental rights, we do not address respondent-father's arguments challenging alternative grounds. *E.g., In re A.R.A.*, 373 N.C. 190, 194 (2019).

**C. Disposition Based On the Juvenile's Best Interests**

At the dispositional stage of a proceeding to terminate parental rights, the trial court must "determine whether terminating the parent's rights is in the juvenile's best interests." N.C.G.S. § 7B-1110(a) (2021). In making its determination,

> [t]he court may consider any evidence, including hearsay evidence as defined in G.S. 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile. In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1)    The age of the juvenile.
>
> (2)    The likelihood of adoption of the juvenile.
>
> (3)    Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4)    The bond between the juvenile and the parent.
>
> (5)    The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6)    Any relevant consideration.

*Id.*

"The trial court's dispositional findings are binding on appeal if supported by the evidence received during the termination hearing or not specifically challenged

on appeal." *In re K.N.L.P.*, 380 N.C. 756, 2022-NCSC-39, ¶ 11 (citing *In re S.C.C.*, 379 N.C. 303, 2021-NCSC-144, ¶ 22). "The trial court's ultimate determination regarding the child's best interests is reviewed for abuse of discretion and will be reversed only if it is 'manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.' " *In re N.B.*, 379 N.C. 441, 2021-NCSC-154, ¶ 11 (quoting *In re T.L.H.*, 368 N.C. at 107).

### 1. *Respondent-Mother*

Respondent-mother argues that the trial court abused its discretion in determining that termination of her parental rights was in Karl's best interests.[5] She challenges the court's findings of fact and its weighing of factors.

The trial court found that Karl had been in placement outside of the home for over two years, "but to date no long term placement ha[d] been identified" for him. The court further found that if Karl is free for adoption, "it is possible once additional resources are available and used he would be adopted." The court's additional findings included the following: While it was clear that Karl loved respondent-mother, as the case progressed, "a level of mistrust" had developed between Karl and his parents, "especially his mother." Karl was placed at a residential psychiatric treatment facility and had "been participating in therapy and [was] working to

---

[5] Respondent-mother does not contest the trial court's determination that it is in the best interests of Jake and Pamela to terminate her parental rights.

process his trauma and how to move forward." Karl spoke with respondent-mother over the telephone near the time of the termination hearing and "explained to her how frustrated he was that she would not do what she needed to do to work her plan." After the phone call, Karl contacted his DSS social worker and explained that "he recognized his mother ha[d] not done all she need[ed] to do to get him out of foster care, and he asked [the social worker] to find him a forever home." It was not in Karl's best interest to return to respondent-mother's home. Although Karl had behavioral issues, he was "working with [DSS] and his placement to help work through those issues and move forward. [Karl] wants to find a forever home, one that accepts him for him."

¶ 50     In accordance with the statutory factors listed in N.C.G.S. § 7B-1110(a), the trial court made the following findings in finding of fact 8:

> A. The age of the juvenile: [Karl] is 9 years old.
>
> B. The likelihood of adoption of the Juvenile: It is feasible once [Karl] becomes free for adoption he will be adopted, as he has a strong desire to find a forever home and [DSS] can utilize additional resources to explore adoptive placements. Moreover, [Karl] is making progress in therapy to help address his behaviors, and it is anticipated this progress will continue.
>
> C. Whether the termination of parental rights will aid in the accomplishment of the permanent plan for [Karl]: The current plan for [Karl] is adoption. Said plan cannot be completed and fully implemented unless the parental rights of the mother and father are terminated. Once [Karl] is cleared for adoption more

resources will become available for [DSS] and [Karl] to aid in finding his forever home.

D. The bond between the Juvenile and the parent: [Karl] has a significant bond with his mother; however, [Karl] is realizing the negative impact his mother has on him. [Respondent-mother] often blamed [Karl] for [DSS]'s involvement, and she refused to support him in a number of his interests. . . . There is a level of mistrust between [Karl] and his parents, especially his mother.

E. The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement: Although [Karl] is not in a pre-adoptive home, he is open and willing to be adopted. He is doing well in his structured placement, and he wants to find a family he can call his own and never have to move again.

F. Any other relevant matters and considerations: [Karl] wants [his DSS social worker] to find him a forever home. [Karl] wants and needs permanency and stability, and the best way to achieve that is through adoption.

¶ 51     Respondent-mother challenges finding of fact 8.D. as minimizing the bond between Karl and herself. She contends that he is protective of her and that as the social worker testified, if respondent-mother complied with her case plan, Karl wanted to return to her home. Respondent-mother contends that the trial court relied too heavily on Karl's statements about this frustration with her.

¶ 52     During the disposition phase, a DSS social worker testified that Karl expressed

> how he was upset with [respondent-mother], that he ha[d] been in care for a very long time, and he did not understand why she was not doing what she needed to do in order for him to go home. . . . [H]e also stated that he was ready to

> move forward and he actually mentioned an adoptive
> home.
>
> . . . .
>
> Even though he's the child, he would be very protective
> over her. And he's never hid the fact that he wanted to go
> home. But in that conversation, he shared with me that he
> was over it. That he was ready to leave foster care, and that
> he felt like there were a lot of people . . . that was [sic]
> willing to help her and she did not take the help.

¶ 53    The record supports the finding that a significant bond existed between Karl and respondent-mother and the inferences that he realized the negative effect respondent-mother's behavior was having on him and that he was developing a mistrust of respondent-mother. *See In re A.A.M.*, 379 N.C. 167, 2021-NCSC-129, ¶ 22 ("We note that '[i]f different inferences may be drawn from the evidence, [the trial judge] determines which inferences shall be drawn and which shall be rejected.' " (alterations in original) (quoting *Knutton v. Cofield*, 273 N.C. 355, 359 (1968)). We overrule respondent-mother's challenge.

¶ 54    Respondent-mother also challenges the finding that termination of parental rights in Karl would make his adoption feasible, even with the additional resources available to DSS, such as stated in findings of fact 8.B. and C. Respondent-mother contends that Karl's "severe behavioral issues and mental health problems" suggest "strongly" that he "was not a candidate for adoption." She points to his history of seventeen placements during twenty-eight months of DSS custody; his diagnoses with oppositional defiant disorder, adjustment disorder with depressed mood,

conduct disorder, post-traumatic stress disorder, and ADHD, and his reported visual and auditory hallucinations; and his treatment at a psychiatric residential treatment hospital at the time of the termination proceeding. Respondent-mother contends that Karl was not going to be back in a foster home "any time soon, and the court's finding that termination would pave the way for DSS to place him for adoption was unsupported."

¶ 55    The record reflects that Karl came into DSS custody on 11 December 2018. His seventeen placements, including hospitalizations, included two placements that lasted for several months each. He was in a kinship placement from 21 December 2018 through October 2019 and in a therapeutic foster placement from October 2019 until September 2020. Between September 2020 and December 2020, he was placed with another therapeutic foster family, had a relative placement, and was hospitalized three times before being admitted to the psychiatric residential treatment hospital in December 2020. He remained in the psychiatric hospital through the date of the disposition hearing conducted on 26 April 2021. During the disposition hearing, Karl's DSS social worker testified that he was "doing great" at the psychiatric hospital. He had been recognized as making progress on his therapeutic goals for the prior twelve weeks, including having no incidents of defying authority figures, and he had been getting along with peers, following the rules and policies of placement, attending school, and meeting with his therapist. His history

of one relative placement and one therapeutic placement, which both lasted almost a year showed that Karl could maintain a placement. When he expressed that he did not understand why respondent-mother had not taken the steps she needed to accomplish in order for him to come home and that he was ready to move forward toward an adoptive home, his social worker described this as a "[h]uge" step for him. The social worker further related that Karl was "doing great" at school and "as long as his home environment is stable, there are no concerns regarding his academics." The social worker explained that if the court terminated respondents' parental rights to Karl, DSS would register him on NC Kids—a national, adoptive website—as well as make contact with adoption recruiter agencies and licensed foster parents within DSS. The social worker, who had twelve years of experience, affirmed her belief that there is "a likelihood" that Karl "could be adopted."

¶ 56        The court's findings that "[o]nce [Karl] is cleared for adoption more resources will become available for [DSS] and [Karl] to aid in finding his forever home," and that "it is feasible . . . [Karl] will be adopted," as stated in findings of fact 8.B. and C., are supported by the record. *See Knutton*, 273 N.C. at 359. Respondent-mother's challenge is overruled.

¶ 57        Respondent-mother argues that the termination of her parental rights will result in the permanent deprivation of the "care of the most consistent adult in [Karl's] life and the person that he most wanted to be with." Claiming that "Karl was

unlikely to be adopted," she asserts the trial court abused its discretion in terminating her parental rights; however, respondent-mother's unsupported assertion is insufficient to establish an abuse of discretion. *See generally In re K.N.L.P.*, 2022-NCSC-39, ¶ 26 ("We . . . have repeatedly recognized that 'the bond between parent and child is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and the trial court is permitted to give greater weight to other factors.' " (quoting *In re Z.L.W.*, 372 N.C. 432, 437 (2019)). The trial court's order reflects its consideration of the dispositional factors set out in N.C.G.S. § 7B-1110(a)(1)–(5), as well as other relevant circumstances as allowed under N.C.G.S. § 7B-1110(a)(6) and indicates that the court performed a reasoned analysis weighing those factors. *See In re N.B.*, 2021-NCSC-154. The determination to terminate respondent-mother's parental rights to Karl appears neither manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision, and "this Court lacks the authority to reweigh the evidence." *In re A.U.D.*, 373 N.C. 3, 12 (2019).

### 2. *Respondent-Father*

¶ 58    Respondent-father does not challenge the trial court's dispositional findings of fact, but he asserts the court abused its discretion in determining termination of his parental rights was in Karl's best interests. Relying on *In re J.A.O.*, 166 N.C. App. 222 (2004), respondent-father asserts that Karl's lack of a prospective adoptive placement, based in part on his "many mental and medical issues," and the benefits

of Karl continuing a legal relationship with his natural relatives, require reversal of the trial court's determination.

¶ 59 We find this case to be distinguishable from *In re J.A.O.* At the time of the termination hearing in that case, J.A.O. was "a troubled" fourteen-year-old who had been shuffled through multiple treatment centers due to his significant physical, mental, and behavioral disorders, yet showed no signs of improvement. *Id.* at 227. But the respondent-mother was "connected to and interested in" him, and she had made progress in correcting the conditions that led to the juvenile's removal from her care. *Id.* at 227–28. The guardian ad litem argued J.A.O. was unlikely to be a candidate for adoption and that termination was not in his best interests because it would "cut him off from any family that he might have." *Id.* at 226–27. Under these exceptional circumstances, the Court of Appeals concluded that the trial court had abused its discretion in terminating the respondent's parental rights. *Id.* at 227–28.

¶ 60 As noted above, Karl was nine years old at the time of the termination hearing, and though he was residing in a psychiatric residential treatment facility, he was making progress on his therapeutic goals. His history of some placements lasting nearly a year showed that he would be capable of maintaining a long-term placement, his social worker believed there was a possibility he would be adopted; and once he was available for adoption, DSS would be able to engage more resources to find him a permanent placement. While respondent-father seems to believe Karl would still be

without a permanent placement by the time respondent-father was released from prison in 2024, three years after entry of the trial court's order, there is no evidence to support such a conclusion. Moreover, unlike the respondent in *In re J.A.O.*, respondent-father has no relationship with Karl. As we concluded above, the trial court's adjudication of willful abandonment is predicated on respondent-father's failure to "take any action whatsoever to indicate that he had any interest in preserving his parental connection with" Karl. *In re A.G.D.*, 374 N.C. at 327. Though respondent-father touts "the stabilizing influence" and "sense of identity" Karl obtains from natural relatives, neither benefit is supplied by respondent-father. His social worker testified that while Karl had no relationship with respondent-father, he maintained contact with his siblings and his former relative placement.

¶ 61        Accordingly, we conclude that the trial court properly considered the statutory factors set forth in N.C.G.S. § 7B-1110(a) and did not abuse its discretion by determining that termination of respondent-father's parental rights was in Karl's best interests. *See In re H.A.J.*, 377 N.C. 43, 2021-NCSC-26, ¶33.

### III.    Conclusion

¶ 62        The trial court did not abuse its discretion by not conducting an inquiry into respondent-mother's competency. *See In re T.L.H.*, 368 N.C. at 108–09. Respondent-mother does not challenge the adjudication of grounds to terminate her parental rights, and the trial court's findings of fact and conclusions of law support its

adjudication of grounds to terminate respondent-father's parental rights for willful abandonment. The trial court did not abuse its discretion in determining that it was in Karl's best interests to terminate both respondents' parental rights. Thus, we affirm the trial court's 25 May 2021 orders terminating respondent-mother's parental rights to Jake, Karl, and Pamela and respondent-father's parental rights to Karl.

AFFIRMED.